Filed 3/14/14  T.B. v. Superior Court CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| T.B. et al., | D064843 |
| Petitioners, | (San Diego Super. Ct. No. NJ013869) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Real Parties in Interest. | |

PROCEEDINGS for extraordinary relief after reference to a Welfare and Institutions Code section 366.26[1] hearing.  Michael J. Imhoff, Commissioner.  Petitions denied.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento for Petitioner T.B.

---

[1]   All statutory references are to the Welfare and Institutions Code.

Law Offices of Michael J. La Cilento and Michael J. La Cilento for Petitioner R.W.

No appearance for Respondent.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Real Party in Interest.

Jessica B. Smith, under appointment by the Court of Appeal, for Minor.

INTRODUCTION

This is the second dependency case for Mary B., the child of father Robert W. and mother T.B. (together, the parents). The first case arose because Mary tested positive for amphetamine at her birth in March 2008, and T.B. admitted using diet pills during pregnancy. During that case, the parents received more than a year of services. The first case ended in July 2009, when the juvenile court awarded Robert custody of Mary, allowed T.B. supervised visitation and terminated the dependency proceeding. The second case began in December 2011, when Mary was three years old. That case arose because Robert physically assaulted T.B. in Mary's presence, the parents had a history of physical altercations in Mary's presence, and the parents refused to participate in services and continued to live together. Mary was detained in foster care, and the court made a true finding on the petition, ordered Mary placed in foster care and ordered reunification services for the parents.

This is the fourth time Robert has sought review in Mary's second dependency. First, Robert appealed the postdispositional summary denial of his modification petition (§ 388), which sought placement or expanded visits. Our court reversed in part and

2

remanded, concluding the court should have granted an evidentiary hearing on the request for expanded visits. (*In re Mary B.* (Nov. 6, 2012, D062247) [nonpub. opn.].) Second, Robert appealed following the January 2013 contested six-month review hearing, challenging the court's finding that it would be detrimental to Mary to be returned to his care. We affirmed. (*In re Mary B.* (2013) 218 Cal.App.4th 1474.) Third, Robert appealed following the April 2013 contested 12-month review hearing, challenging the detriment finding. We affirmed. (*In re Mary B.* (Oct. 22, 2013, D063696) [nonpub. opn.].)

In May 2013, while the appeal from the 12-month review hearing was pending, Mary began a trial visit with Robert. In June, at T.B.'s request, the court set a contested 18-month review hearing for August. In July, the San Diego County Health and Human Services Agency (the Agency) filed a supplemental petition (§ 387) for five-year-old Mary, alleging Robert had allowed Mary to stay with T.B., who had not participated in services, and Robert had been staying in T.B.'s home. Mary was detained. The court vacated the contested 18-month review hearing date and ordered that hearing would trail the adjudication and dispositional hearing on the section 387 petition.

In October, the court made a true finding on the section 387 petition; ordered Mary removed from parental custody and placed with relatives; and found the parents had been provided reasonable services. The court terminated reunification services; vacated the trailing contested 18-month review hearing over the parents' objections; and

3

set a section 366.26 hearing.[2]  By that time, the parents had received more than 20 months of services in this dependency case, and more than one year of services in the first case.  Mary was five and one-half years old, and had been in the dependency system for more than four years.

The parents seek writ review of the order terminating services and setting the section 366.26 hearing.  They argue the court denied them due process by vacating the contested 18-month review hearing; substantial evidence does not support the reasonable services findings; and the court abused its discretion in finding that it would be detrimental to Mary to be returned to Robert's custody.  We deny the petitions.

FACTUAL AND PROCEDURAL BACKGROUND

I.  *Summary of Prior Opinions*

The facts preceding the April 2013, 12-month review hearing are set out in detail in this court's three prior opinions.  Those opinions reflect the following facts.  In December 2010, Robert was arrested for domestic violence after "push[ing] [T.B.] against a door causing her to hit her head while she held Mary in her arms."  (*In re Mary B., supra*, 218 Cal.App.4th at p. 1477.)  On November 19, 2011, Robert threatened to kill T.B. and assaulted her while she was holding Mary.  The incident took place in T.B.'s home, where Robert often resided.  Robert was arrested and charged with domestic violence and child endangerment.  He admitted there had been two earlier instances of

---

[2]     T.B. did not appear on the last day of the hearing, although she had been ordered to appear.

4

domestic violence. (*In re Mary B., supra*, at pp. 1477-1478.) By 2012, "Robert's aggressive behavior was escalating" (*id.* at p. 1478), and he was aggressive with Mary's caregiver, nonrelative extended family member Stephanie S., as well as with T.B. (*Id.* at p. 1482.) Stephanie " 'stated that she doesn't know if [Robert] is able to control himself while [Mary] is in his care and is scared that [Mary] could get hurt if [Robert] becomes enraged.' " (*Id.* at p. 1482 (bracketed text in original).) Robert denied he had " 'a violence problem' " while acknowledging "his anger and yelling affected [Mary]."

In addition to her history of substance abuse, T.B. had longstanding emotional problems which impaired her judgment, impeded her ability to set boundaries with Robert and led to her tolerance of his violent behavior. Throughout the case, the parents were uncooperative with the Agency, deceptive and manipulative. They refused to abide by the court's orders, including requirements for supervised and separate visits, designed to protect Mary from domestic violence. Robert identified T.B. as a trigger for his anger, yet continued to have contact with her. Despite this demonstration of his poor judgment, Robert made progress on his case plan. He obtained good reports from his domestic violence group leader and his therapist, while continuing to engage in violent and threatening behavior, eventually leading the two service providers to "question[] 'his credibility.' " (*In re Mary B., supra*, 218 Cal.App.4th at p. 1484.)

This court's third opinion quotes an apt observation by the juvenile court at the 12-month review hearing:[3] " 'Both parents will participate in services, and then suddenly this case will just turn on its head. [¶] The information that once appeared to be reliable and solid is nothing more than quicksand, and that's not just on one particular point this time. It's a recurring theme . . . .' " (*In re Mary B., supra*, D063696.) This court continued: "Although Robert had made substantive progress with his case plan, he had shown poor judgment throughout the dependency . . . . Thus, while Robert had taken steps to control his anger, there was substantial evidence he had not yet resolved the problem—at least with respect to T.B. Hence, the risk of harm to Mary's emotional and physical well-being in this coparenting situation remained. [¶] Additionally, Robert had yet to demonstrate that he would not continue his pattern of bringing Mary to T.B.'s residence and leaving her there during *his* visits, when T.B. was not authorized to have Mary in her care. . . . [¶] . . . [¶] . . . Robert's remaining anger problems with T.B. and his questionable ability to abide by court orders and visitation guidelines were directly related to the issues that led to the dependency." (*Ibid.*)

## II. *Facts Relevant to the Pending Appeal*

In May 2013, the social worker reported that T.B.'s participation in services was inconsistent and she had "made minimal progress toward her case plan goals." T.B. had missed 13 drug tests and had tested only twice. She had made no progress in therapy, had not made a safety plan and was not enrolled in a domestic violence program. T.B.

---

[3] The same bench officer presided throughout both dependency cases.

believed "she ha[d] been protective of [Mary] . . . and [did] not understand the protective issue."

Robert had completed his domestic violence course in February 2013 and improved his ability to manage his anger. In May, Mary began the trial visit with Robert in the paternal grandmother's home. T.B. had unsupervised visits at the maternal grandfather's home, and supervised visits elsewhere. Robert was not authorized to supervise T.B.'s visits, and the parents were not allowed to be together in Mary's presence.

Approximately one week after the trial visit began, the social worker made an unannounced visit to the paternal grandmother's home. Robert and Mary were not there. The paternal grandmother said she had last seen them the previous night, and they did not spend every night in her home. The next day, Robert told the social worker he and Mary had spent the night at the home of his girlfriend, Michelle O., "last weekend."[4] Michelle told the social worker Robert spent "the night at her house occasionally, at the most three times a week."

Also in May 2013, T.B. underwent a psychological evaluation. The psychologist reported T.B. "lacks assertiveness and continues to repeat prior mistakes" and her personality disorder "limits her insight, impairs her judgment and apparently reduces her motivation to participate in services." The psychologist opined T.B. "seems unlikely to benefit from [reunification] services." T.B.'s therapist echoed these opinions and noted

---

[4] The unannounced visit took place on a Tuesday.

T.B. "does not seem to perceive events accurately" and "tends to blame others and minimize her issues."

In June 2013, Robert completed the therapy component of his reunification plan.

On the afternoon of July 17, 2013, the social worker paid an unannounced visit to T.B.'s home. T.B.'s boyfriend, Steve J., answered the door and said T.B. was not there. Mary then came to the door and the social worker interviewed her outside. Mary said she had been living with T.B. for " 'a long time' " and Robert and Steve also lived in the home. Mary said the parents were currently at home, and Steve eventually admitted that was true. The social worker asked Steve to have the parents come out. Steve agreed and went in the house. When he returned, he said the parents were " 'scared to come out.' " Steve also said the parents had been living in T.B.'s home " 'since [Robert] got [Mary] back.' "

Robert then "came out from the side of the house," denied he had been inside, and claimed he had been painting the neighbor's fence.[5] He then admitted he had been in the home, but had been afraid to come out because " 'we were told not to be here with [Mary].' " He said he had never slept in the home. He appeared sweaty, "fumbled over his words" and had dilated pupils, but denied being under the influence of drugs or alcohol.

---

5    There was no wet paint on the fence and there were no painting supplies in evidence.

Robert and Steve told the social worker that T.B. had " '[run] out the back' " of the house. Several hours later, T.B. returned and admitted she had been in the home but had been afraid to come out and talk to the social worker. T.B. denied Robert was staying in her home but admitted Mary had been living with her for "a couple of months."

Pursuant to an agreement between the parents and the social worker, Stephanie picked up Mary to care for her pending a team decision meeting. The social worker asked the parents to drug test. They agreed, but a short time later Robert refused. The parents did not test.

Beginning on July 18, 2013, the Agency unsuccessfully tried to reach Stephanie to inform her of the team decision meeting. The meeting took place on the morning of July 19 with the parents and Agency personnel in attendance. The parents said they had been unable to reach Stephanie, but were sure Mary was with her. At the meeting, it was agreed that Mary would remain with Stephanie and the parents would drug test that day.

Robert did not submit to a drug test. T.B. did not go to the Agency's designated testing site, but went to another testing facility, where she paid to have an unobserved urine test. The results were negative.

After the team decision meeting, the Agency was unable to find Mary. On the afternoon of July 19, 2013, Stephanie's boyfriend told the Agency that Mary had not been at their home since July 17. Later in the day on July 19, Stephanie told the Agency that Robert had picked up Mary from Stephanie on the night of July 17 and, on July 19, the parents had sent Stephanie text messages, instructing her to tell the Agency that Mary

was with her. Stephanie said Mary was now with her; Steve had dropped her off unannounced.

At 8:00 p.m. on July 19, 2013, Robert told the social worker that he had left Mary with a friend, Tina G., while the parents attended the team decision meeting, and insisted he did not know Mary's current whereabouts. He agreed, however, to bring Mary to Polinsky Children's Center.

On July 20 or 21, 2013, Stephanie brought Mary to Polinsky Children's Center. Mary was moved successively to a foster home, to the maternal grandparents' home and to the home of a maternal aunt and uncle. In September, Mary told the social worker that T.B. had told her to say that Robert was painting a fence during Mary's visit with him.

By October 2013, T.B. had not completed her services. She had made a safety plan, but it omitted any reference to substance abuse. T.B. had attended two weekly sessions of a 28-session domestic violence course and had missed one session. She remained evasive and continued to blame others rather than accepting responsibility for the dependency. Robert had completed his services, but had refused to let the social worker inspect the paternal grandmother's home, where he planned to live with Mary if she were returned to him. The home was in a senior community, and Mary would be allowed to live there for 20 days, then Robert would have to obtain an extension from the board of directors of the owners' association. The parents were not submitting to drug testing, and the Agency concluded that after 18 months of offered services, they still lacked insight into protective issues and remained as uncooperative and deceitful as they had been at the beginning of the case.

The court agreed with the Agency's conclusions and found true the allegations of the section 387 petition. The court ordered Mary removed from parental custody, found the parents had been provided reasonable services, terminated services, vacated the 18-month review hearing and set a section 366.26 hearing. In so doing, the court found Mary, the social worker and Steve credible and the parents not credible. We accept these credibility determinations. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.)

The parents petition for review of the court's orders. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452.) This court issued an order to show cause, the Agency responded and the parties waived oral argument.

### DISCUSSION

The parents contend the court improperly relied on California Rules of Court,[6] rule 5.560 when it set a section 366.26 hearing. They further contend that the court denied them due process and abused its discretion by vacating the setting of the contested 18-month review hearing, thus depriving them of their right to be heard, present evidence and cross-examine witnesses. The parents also contend the court's calendar was so heavy that it did not have the time for a meaningful hearing. T.B. also contends the court should have allowed her further reunification services.

---

[6]    All further rule references are to the California Rules of Court.

## I. *Alleged Rule Violation and Due Process Claims*

During argument at the hearing on the section 387 petition, Mary's trial counsel urged the court to set a section 366.26 hearing and, in doing so, referred to the content of rule 5.565(f), but cited rule 5.560(f). The court also mistakenly cited rule 5.560(f)[7] while referring to the content of rule 5.565(f). Rule 5.565(f) states: "If a dependent child was returned to the custody of a parent . . . at the 12-month review or the 18-month review or at an interim review between 12 and 18 months and a [section] 387 petition is sustained and the child removed once again, the court must set a hearing under section 366.26 unless the court finds there is a substantial probability of return within the next 6 months or, if more than 12 months had expired at the time of the prior return, within whatever time remains before the expiration of the maximum 18-month period."

We agree rule 5.560(f) is inapplicable, but find there is no reversible error as it is clear the court articulated and applied the correct legal standard; it merely misstated the rule number. Here, the 18-month date was in June 2013, during Mary's 60-day visit with Robert. After that, the section 387 petition was sustained and Mary was again removed from Robert's home. Because the 18-month period had passed, the court was required to set a section 366.26 hearing. (Rule 5.565(f); *In re G.W.* (2009) 173 Cal.App.4th 1428, 1438-1441; *Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 163-167.)

In any case, the court stated that if it had the discretion to extend the 18-month period for services, it would decline to exercise that discretion in light of the facts of this

---

[7] Rule 5.560(f) relates to the correction of clerical errors.

case. The court noted that Robert had previously convinced his therapist and the court that he was working on his issues, but since then Robert had gained no insight and learned no lessons and "finds himself in the very same predicament after a relatively short period of time." The court also observed that T.B.'s therapist and psychological evaluator had little confidence T.B. could follow a safety plan because she could not follow the court's orders. The record amply supports these findings.

Moreover, contrary to the parents' claim (and as set forth in detail below), the record clearly reflects they were afforded the opportunity to be heard, present evidence and cross-examine witnesses. During the adjudication phase of the section 387 hearing, the parents cross-examined the social worker and her supervisor; Robert called five witnesses; and the parents testified. During the dispositional phase, the parents testified again. The court took the time necessary for a meaningful hearing.

## II. *Reunification Services*

The parents challenge the reasonable services finding, and contend they were denied due process because they were precluded from presenting evidence and cross-examining the social worker on the reasonable services issue.

A reasonable services finding is not a prerequisite to the setting of a section 366.26 hearing. (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1504.) In any case, the parents cannot now challenge the reasonableness of services preceding the April 2013 reasonable services finding. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811.) As to the subsequent period, it is clear from the record that the parents were

13

offered reasonable services. Furthermore, the court allowed the parents to present evidence and cross-examine the social worker on the reasonable services issue.

The parents argue the social worker did not contact them for almost two months, during which time there was no social worker assigned to the case, and the Agency "impeded drug testing." For the two weeks before July 1, 2013, there was no social worker assigned to this case, but an Agency supervisor provided coverage. The Agency did not "impede[] drug testing"; rather, the parents failed to comply with the social worker's testing instructions. Robert argues he was precluded from presenting evidence of his need for housing that would allow for Mary's return. However, in light of his insistence that Mary could live with him in the paternal grandmother's home, there was no indication he needed housing assistance.

T.B. argues the Agency did not provide her timely and appropriate referrals for domestic violence counseling between May and October 2013. It was not until August, however, that T.B. left a message for the Agency requesting additional domestic violence course referrals. In response, the social worker tried to contact T.B. on several occasions, but was unable to reach her until October. T.B. began a new domestic violence class that month, after failing to keep several appointments.

T.B. argues the Agency did not provide services geared to her special needs, as recommended in her psychological evaluation, and she was precluded from presenting evidence of her need for psychotropic medication referrals to address her anxiety and attention deficit hyperactivity disorder, which impaired her ability to comply with her case plan. T.B. delayed submitting to a psychological evaluation for more than five

14

months.  Then, after receiving the evaluation, the social worker tried to reach T.B. several times regarding various matters, but was generally unsuccessful.  The evaluator's report, received by the Agency in late May 2013, recommended regular, long-term "behavior therapy, cognitive therapy, or interpersonal therapy"; noted T.B. was "not likely to benefit from traditional talk therapy"; and stated she "should complete a psychiatric evaluation" since "she would likely benefit from psychotropic medication." T.B.'s therapist reviewed the evaluator's report and in September stated the report "was helpful in that it confirmed much of what was already being seen in therapy . . . ."  The therapist also noted that in the last two months, T.B. had made progress, although T.B. used some of her therapy sessions to refute the social worker's reports, a practice the therapist had told her was not helpful.

" 'It is . . . well established that "[r]eunification services are voluntary, and cannot be forced on an unwilling or indifferent parent.  [Citation.]" ' "  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1233, quoting *In re Jonathan R*. (1989) 211 Cal.App.3d 1214, 1220.) There is no " 'requirement that a social worker take the parent by the hand and escort him or her to and through [services].' "  (*In re Nolan W.*, at p. 1233, quoting *In re Michael S*. (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)  " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' "  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599, quoting *In re Misako R*. (1991) 2 Cal.App.4th 538, 547.)  "We determine whether substantial evidence supports the trial court's finding, reviewing the evidence in a light most favorable to the prevailing party and indulging in all legitimate

and reasonable inferences to uphold the court's ruling." (*Katie V.*, at p. 598.) In this case, the parents had a full and fair hearing concerning the reasonableness of their services, and substantial evidence supports the reasonable services finding.

### III. *Removal*

Robert contends there is no substantial evidence that Mary's return to his care "would create a substantial risk of detriment to [her] safety, protection, or physical or emotional well-being . . . ." (§ 366.22, subd. (a).) Although detriment is an issue at an 18-month review hearing as noted above, the court properly vacated the contested 18-month review hearing.

At the dispositional phase of a section 387 hearing, detriment is not an issue. Rather, the court applies section 361, subdivision (c) to determine whether to order the child removed from the parent's custody. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 462.) Here, the court ordered Mary removed from Robert's custody pursuant to section 361, subdivision (c)(1). That subdivision states: "A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . : [¶] . . . There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody. . . ." In ordering Mary's removal, the court stated that once again, Robert found "himself in the very same predicament after a relatively short period of time," and once

16

again, he had not gained the insight he claimed. The court noted that the parents continued to violate orders designed to keep Mary safe, and even lived together with her.

Robert argues he acted appropriately during visits; there were no concerns about his living conditions; there was no evidence "linking [his] behavior in May to October [2013], . . . to his parenting judgment or skills"; and there was no evidence he physically or emotionally abused Mary, currently engaged in domestic violence, used drugs,[8] or posed a danger to Mary.

Robert allowed T.B. to participate in his visits with Mary, in violation of the court's orders. His living conditions were of grave concern. He was again residing with T.B., the same volatile situation that led to the filing of the second dependency petition. Robert continued to exercise poor judgment, violate court orders designed to protect Mary and be dishonest with the Agency and the court. Robert's physical abuse of T.B. and yelling in Mary's presence had caused Mary emotional distress, and he still lacked insight into the protective issues.

"The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus . . . is on averting harm to the child." (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1136.) The court may consider the parent's past conduct and current situation and gauge whether he has progressed sufficiently to eliminate any risk. (*In re S.O*. (2002) 103 Cal.App.4th 453, 461; cf. *In re*

---

[8]    The court noted that drug testing was not part of Robert's case plan, and "did not draw any negative conclusions from . . . his position that he did not feel he needed to test."

*Jonathan R., supra*, 211 Cal.App.3d at p. 1221.)  On appeal, the parent has the burden of showing there is no substantial evidence supporting the removal order.  (*In re Diamond H., supra*, at p. 1135; *In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)  Robert has not met that burden.  Substantial evidence supports the findings underlying the removal order.[9]

## DISPOSITION

The petitions are denied.  This court's order of February 13, 2014, staying the section 366.26 hearing, is vacated.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


MCDONALD, J.

---

[9]    The same evidence would also support a detriment finding.